(C. D. 1066)

## C. J. TOWER & SONS v. UNITED STATES

United States Customs Court, Second Division

(Decided October 23, 1947)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett* and *Richard H. Welsh*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: This case presents for our consideration the proper classification of an imported commodity described on the commercial invoices as "Abrasive Sludge 81."  It was classified by the collector of customs under the provision for—

Ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum.

and duty was assessed thereon at the rate of 1 cent per pound on the silicon contained therein under paragraph 302 (i) of the Tariff Act of 1930, as modified by the trade agreement between the United States and Canada, effective January 1, 1939, 74 Treas. Dec. 235, T. D. 49752. The principal claim of plaintiff is that the merchandise is entitled to free entry under paragraph 1664 of said act which provides for—

Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

or dutiable at 7½ per centum ad valorem under paragraph 1555 of said act, as modified by the trade agreement with Canada, *supra*, as—

Waste, not specially provided for.

It is also contended by plaintiff that prior to the return for duty in this case there had been an established and. uniform practice of classifying this merchandise free of duty under paragraph 1664 and that consequently the assessment in this case is contrary to the provision in section 6 of the Customs Administrative Act of 1938 (19 U. S. C. A. § 1315), which reads in part—

\* \* \* No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; \* \* \*.

This latter claim, however, is not seriously pressed, and as we do not deem it meritorious it will not receive further consideration.

The case was originally heard at the port of Buffalo where plaintiff introduced the testimony of several highly qualified witnesses for the purpose of establishing primarily that the commodity under consideration is not ferrosilicon. At that time the Government also introduced the testimony of Charles E. Makey, chief chemist of the Hanna Furnace Corporation, and Thomas J. O'Connell, buyer in the purchasing department of the same corporation.

When the case was subsequently called for hearing at New York, counsel for the United States stated that an extensive investigation had been conducted by special agents and that "As a result of that investigation, the special agent and myself have reached the conclusion that the merchandise is not ferrosilicon; that it was improperly classified and, we concede that it is not properly dutiable as ferrosilicon."

At this point the Government introduced a new angle into the case, contending that the merchandise under consideration is properly dutiable at 25 per centum ad valorem under paragraph 302 (o), Tariff Act of 1930, which provides for—

All alloys used in the manufacture of steel or iron, not specially provided for * * *.

From an examination of the record we are of the opinion that said merchandise is not, in fact, ferrosilicon within the contemplation of paragraph 302 (i), *supra*, and that the Government properly made that concession.

It was subsequently conceded in the brief filed by the Government that if the involved merchandise is not properly dutiable under paragraph 302 (o), *supra*, as an alloy used in the manufacture of iron, it is classifiable free of duty under paragraph 1664, *supra*, as a metallic mineral substance in a crude state.

It appears from the record that this so-called "Abrasive Sludge 81" is an unwanted byproduct resulting from the treatment of bauxite to produce an abrasive. The process is described by one of the witnesses as follows:

The aloxite electric furnace, as we operate it, is a metal shell on the bottom of which is placed a coke and tar bottom approximately fifteen inches thick. It's rammed in. The shell is iron, water cooled on the outside. The operation of the furnace is to feed in bauxite, establish an electric arc, two electrodes. The bauxite is melted with sufficient carbon there 'to reduce some of the impurities, such as iron oxide, silica, and a small amount of titanium oxide. These impurities when they are reduced, come out in the metallic state. These metals are heavier than the alumina, melted alumina bath settled out of the bath. This metallic material first reaching the carbon bottom through the settling, penetrates into the carbon bottom to the extent of possibly six inches. In other words, the carbon bottom acts as a sort of a sponge absorbing this material which is settling out.

After we have established this bottom consisting of these metals plus the carbon it becomes impervious and the remainder of the metallic material settles out as the furnace is filled up. This molten material collects on top of this bottom, metalized bottom, and forms what is ordinarily known as ferrosilicon. I'm not sure that's the correct term for it. We call it byproduct ferrosilicon. It's really a byproduct.

The court then asked—

Judge LAWRENCE: What is the main thing you are trying to produce when this comes off as a byproduct?

The WITNESS: We're producing abrasives and we do not control this metallic material at all. It's absolutely a byproduct. We have no interest in it other than what little salvage we can get by selling it.

After a sample of byproduct ferrosilicon was introduced into evidence and marked "Plaintiff's Illustrative Exhibit A," the witness continued his description of the method of producing the product, exhibit 1, here in issue, as follows:

After the furnace is full of molten material the power is taken off and the bath is allowed to solidify. The furnace is then dumped and we have on the very

bottom of this so-called pig ingot a layer of carbon which is formed, of course, from the coke which was originally put in. Just above that we have a layer of possibly three or six inches thick of this mixture of metallic material which has come down and been absorbed by the carbon. I haven't the analysis before me but I would say that the carbon in there might vary ·from something under twenty percent to possibly over thirty percent. That's my recollection. The metallic material also varies very considerably in content from time to time. Above this so-called sludge is a layer of this by-product ferrosilicon which might be four to six inches thick, and above that is the aluminous abrasive material.

and added that this so-called sludge is sometimes called furnace ·sludge or abrasive sludge.

It appears, however, that a use for the commodity has arisen and that it is thrown into the furnace charge in the production of what is known as "silvery iron."

The record before us poses the following questions:

1. Is the commodity an alloy?

2. If so, is it used in the manufacture of steel or iron within the meaning of paragraph 302 (o), *supra?*

3. If the above questions are answered in the negative, is the commodity a metallic mineral substance in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for, and classifiable under paragraph 1664, *supra?*

4. Is it more specifically provided for as a waste enumerated in paragraph 1555, *supra?* ·

In arriving at the answer to the first question, "Is the commodity an alloy?", resort to the record discloses a divergence of opinion between the witnesses for the plaintiff and those for the defendant.

Otis Hutchins, technical director of Canadian Carborundum Co., Ltd., Niagara Falls, Ontario, shipper of the merchandise in controversy, testifying on behalf of the plaintiff, stated that exhibit A (by-product ferrosilicon) differed from exhibit 1 (the furnace or abrasive sludge) in that the former runs about 95 per centum metallic material, consisting mostly of iron and silicon, the silicon ranging from 7 to 12 per centum. There is also about 4 or 5 per centum aluminum oxide. The furnace sludge contains from slightly under 20 per centum to a little over 30 per centum of carbon which is not metallic. The by-product ferrosilicon has a metallic look; a silvery color, characteristic of a metallic alloy. The furnace sludge just looks like a waste product; it is a black porous mass, and would not be classified as byproduct ferrosilicon on account of the high carbon content.

Mr. Hutchins further testified that there is more or less uniformity in composition of exhibit A. It varies, but within certain limits. But with exhibit 1, there is no uniformity of analysis at all from furnace to furnace.· He stated, however, that exhibit 1 has the same metals by name as exhibit A, although a different quantity, and also has the carbon.

Plaintiff's witness Robert K. Glass, acting chief metallurgist for the Republic Steel Corporation, Buffalo, N. Y., testified, in part, that he did not consider exhibit 1 an alloy of any kind, primarily on account of the high percentage of carbon content, and that when exhibit 1 is used in manufacture of silvery pig iron, it is not used as an alloy but merely to salvage the iron content.

Alexander MacDonald, assistant to the general superintendent of the Hanna Furnace Corporation, Buffalo, N. Y., manufacturer of iron of all grades, appeared as a witness for plaintiff and stated that exhibit 1 is "added to the furnace burden as part of the raw materials, a very small percentage, and goes through the furnace, remelted, and incorporated in the product, the iron." By "very small percentage" he means not over 5 per centum. The product made with the use of exhibit 1 is silvery iron. He stated further that analysis is made of every shipment of merchandise like exhibit 1 to determine the iron and silicon content so that they know what is going into the furnace. The iron content should be high enough to justify the price and it should give a yield that is favorable compared with iron ore at its price, and the silicon content in making silvery iron should be "worthwhile," meaning about 8 per centum.

Defendant called as a witness J. B. Austin, assistant director of the research laboratory of the United States Steel Corporation. After having had read to him from the record the manner in which the imported merchandise in controversy is produced and its analysis, he expressed the opinion that exhibit 1 is an alloy, a ferrous alloy, because its chief constituent is iron "and the others which is alloyed with apparently varying percentages of silicon, aluminum, titanium and various other impurities." He further testified that the fact that the merchandise represented by exhibit 1 has carbon of from 19 to 30 per centum does not deprive it of its status as an alloy, nor does the fact that it was produced as a byproduct rather than as a primary product.

Dr. Thomas E. Read, head of the mining and metallurgy department of Columbia University, appeared as a witness in behalf of the defendant. He stated that in his opinion the merchandise represented by exhibit 1 is a metallic alloy, an intimate mixture of one metal with something else, which might not be a metal. He stated that 19 per centum of carbon does not deprive exhibit 1 of its status as a metallic alloy, nor does it make any difference how it was made. He testified further that exhibit 1 comes within the definition of "alloy" read to him from the Metals Handbook of the American Society for Metals, 1939 Edition, page 3, as follows: "Alloy—a mixture with metallic properties composed of two or more elements of which at least one is a metal."

Since there has been no attempt to establish a commercial meaning for the term "alloy" different from its common meaning, the word as used in the statute must be given its ordinary meaning. *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117. Reference to lexicographic and other standard authorities discloses the following definitions:

Webster's New International Dictionary, 2nd Ed. 1939:

*alloy, n.*

\*        \*        \*        \*        \*        \*        \*

2. A substance composed of two or more metals intimately mixed and united, usually by being fused together and dissolving in each other when molten; as, brass is an *alloy* of copper and zinc; also, the state of union of the components. By extension, a similar substance formed by the union of a metal and a non-metal; as steel is an *alloy* of iron and carbon.    \*    \*    \*

Funk & Wagnalls New Standard Dictionary of the English Language (1942):

*alloy, n.*

1. A homogeneous compound or mixture of two or more metals, as brass, formed by the fusion of copper and zinc, or bronze, consisting of copper and tin: commonly produced by fusing together the constituent metals.    \*    \*    \*

Knight's American Mechanical Dictionary:

*Alloy.* An alloy is a combination by fusion of two or more metals, as brass and zinc, tin and lead, silver and copper, etc.

Many alloys are composed of definite chemical proportions of their component metals, whilst in others the metals unite in any proportions.

\*        \*        \*        \*        \*        \*        \*

The New Century Dictionary of the English Language:

*alloy*    \*  .  \*    \*    A substance composed of two or more metals (or, sometimes, a metal and a non-metal) which have been intimately mixed by fusion, electrolytic deposition, or the like; also, an inferior metal mixed with a more valuable one    \*    \*    \*.

Encyclopaedia Britannica, Vol. 1, page 662, under "alloys" states in part—

A definition of alloy is given by the American Society for Testing Materials, 1939, as follows: "A substance having metallic properties, consisting of two or more metallic elements or of metallic and non-metallic elements, which are miscible with each other when molten, and have not separated into distinct layers when solid."

In The New International Encyclopaedia, Vol. 1, page 447, we find the following:

*Alloy*    \*    \*    \*.    A mixture of two or more metals, usually produced artificially by fusion, although sometimes found native.

Van Nostrand's Scientific Encyclopedia (1938), at page 46, defines "alloys" as follows:

*Alloys.* An alloy is a substance having metallic properties, consisting of two or more metallic elements, or of metallic and non-metallic elements, which are miscible with each other when molten, and have not separated into distinct layers when solid. For a simple binary alloy (2 elements only), there are, apart from the formation of definite inter-metallic compounds, two opposite processes of solidification, plus their intermediate combinations.

The constitution of the solidified alloy is often quite complex. It may be homogeneous or very inhomogeneous, consist of a uniform mixture of microscopic crystals or may be partially separated into layers. The formation of chemical compounds between the component metals complicates the study of alloy constitution. * * *

Also, H. O. Hofman in his text on "General Metallurgy" states at page 33—

An alloy is a solidified solution of two or more metallic substances. * * *

And in "Alloys and Their Industrial Applications" by Edward F. Law, an "alloy" is defined at page 2 as follows:

* * * a coherent metallic mass produced by the intimate mixture, whether by fusion or otherwise, of two or more metals or metallic substances.

In the Metals Handbook, 1939 Edition, page 3, we find—

*Alloy*—A mixture with metallic properties composed of two or more elements of which at least one is a metal.

An analysis of the merchandise represented by exhibit 1, agreed upon at the hearing by counsel for the parties herein, is as follows:

| | |
|---|---|
| Silicon | 8. 92% |
| Iron | 57. 02% |
| Aluminum | 1. 85% |
| Titanium | 1. 30% |
| Phosphorus | 0. 34% |
| Carbon | 19. 0% |
| Aluminum oxide | 4. 62% |
| Remainder | 6. 95% identity unknown, |

with the following important reservation:

* * * that there are variations in the analysis of different shipments; that the carbon varies from slightly under 20 percent to over 30 percent; that the silicon content varies from about 6 percent to about 9 percent and that the other elements vary accordingly.

It will be noted in connection with the analysis above set forth that iron, aluminum, and titanium are metallic elements.

The alloying qualities of iron are described in "Metals and Their Alloys" by Charles Vickers, at page 112, as follows:

*Iron alloys.*—Iron alloys readily and in all proportions by weight with aluminum, antimony, chromium, cobalt, gold, manganese, nickel, platinum, tin, titanium, tungsten, vanadium, and with greater difficulty with larger quantities of copper, though smaller quantities of the latter are readily absorbed by iron, and smaller quantities of iron by copper. . .

The merchandise in controversy, represented by exhibit 1, being a product, even though adventitious, of a smelting operation which

creates an intimate mixture of the fusible metallic and nonmetallic elements therein contained, comes within the common meaning of the word "alloy" as set forth, *supra*, and we so hold.

The first question propounded, to wit, "Is the commodity an alloy?" being answered in the affirmative, we pass to the next question, "Is it used in the manufacture of steel or iron within the meaning of paragraph 302 (o), *supra*?".

Reference to the legislative history of said paragraph fails to disclose any information to the effect that Congress intended the words "used in the manufacture of   *   *   *   iron" to have any other than their common meaning.

The record indicates that the importation in question was sold by the importer to the Hanna Furnace Corporation at Buffalo, N. Y. On the question of its use, Alexander MacDonald, assistant to the general superintendent of that corporation, appearing as a witness for the plaintiff, testified as follows:

Q. Are you familiar with the use of Exhibit 1 in your plant?—A. In our plant, yes.

Q. Will you please describe how Exhibit 1 is used in your plant?—A. It is added to the furnace burden as part of the raw materials, a very small percentage, and goes through the furnace, remelted, and incorporated in the product, the iron.

Q. You said a very small percentage. What percentage?—A. Not over five percent.

Q. And what is the product which you make with the use of Exhibit 1?—A. Silvery iron.

Plaintiff's witness Glass, acting chief metallurgist of the Republic Steel Corporation, also testifying as to use of material like exhibit 1, stated as follows:

X Q. Mr. Glass, do you ever manufacture for your use, in the production of steel, pig iron having a specific silicon content?—A. Yes, known as silvery iron.

X Q. And do you know how that is manufactured?—A. Yes, ma'am.

X Q. How is it manufactured?—A. Manufactured as a product of a blast furnace.

X Q. In the manner that you described of which Exhibit 1 is used?—A. Yes, ma'am.

X Q. What is the minimum specific silicon content in such pig iron that you have just mentioned?—A. Silvery iron?

X Q. Yes.—A. We use it from eight percent to twelve.

X Q. Eight to twelve percent?—A. Yes, ma'am.

X Q. Is ferrosilicon used for anything else other than the manufacture of pig iron or steel that you have just described?—A. Are you referring to ferrosilicon or Exhibit A or 1?

X Q. Well, are Exhibits 1 and A used for any purposes other than those that you have just described?—A. This Exhibit A might be used in cupolas, iron cupolas for the production of cast iron, although it would be limited.

X Q. And Exhibit No. 1 has no other use than the one you have described, is that right?—A. No.

X Q. And then the other use that you mentioned for Illustrative Exhibit A is a minor use; is that correct?—A. That's right.

The chief if not exclusive use of the imported material represented by exhibit 1 having been shown to be in the manufacture of iron, the use requirement of paragraph 302 (o), *supra*, is satisfied.

A case having certain aspects which bear on the present controversy was before our appellate court in *United States* v. *Tower & Sons et al.*, 10 Ct. Cust. Appls. 155, T. D. 38401. In that case certain metallic material was classified by the collector as ferrosilicon and assessed for duty at the rate of 15 per centum ad valorem under the provisions of paragraph 102 of the Tariff Act of 1913 for—

Chrome * * * ferrophosphorus, ferrotitanium * * * ferrosilicon, and other alloys used in the manufacture of steel, not specially provided for in this section * * *.

The importers protested that the merchandise was not dutiable as ferrosilicon or otherwise at 15 per centum ad valorem under said paragraph and claimed, *inter alia*, that the material was dutiable at only 10 per centum ad valorem as a metallic mineral substance in a crude state under paragraph 154, or as waste under paragraph 384. (Paragraphs 154 and 384 of the Tariff Act of 1913 are the predecessors to paragraphs 1664 and 1555 of the Tariff Act of 1930.)

From an examination of the opinion of the court in that case it appears that the merchandise there in controversy, shown to be used in the manufacture of steel, was a product which collects at the bottom of furnaces after the production of crude aluminous abrasive. That whereas commercial ferrosilicon is used in the manufacture of steel, there was some testimony to the effect that the material there involved was unsuited for such use because of its high phosphorus and high sulphur content. It appears further that most of the importations contained from 13 to nearly 17 per centum silicon as against electrolytic or Bessemer ferrosilicon, high-grade products made to specifications, containing 25 to 50 per centum silicon. The court there found that the imported material was low-grade ferrosilicon stating—

* * * while the later provision [Paragraph 102, Tariff Act of 1913] may exclude ferrosilicon, which because of a high phosphorus, sulphur, aluminum, titanium, or other content, can not be used for the making of steel, it can hardly be contended that it excludes a ferrosilicon which is actually used for the manufacturing purpose specified.

and affirmed the collector's classification.

In the case here under consideration, although it has been conceded by the Government that the furnace sludge does not come within the provision of paragraph 302 (i), *supra*, for ferrosilicon containing from 8 to 30 per centum of silicon, the high carbon content cannot defeat its classification under paragraph 302 (o), *supra*, as an alloy used in the manufacture of iron when it has been shown that the material conforms to the common meaning of the word "alloy" and is actually used for the manufacturing purpose specified.

Since it has been found that the merchandise in controversy comes within the purview of paragraph 302 (o), *supra*, as an alloy used in the manufacture of iron, not specially provided for, it is unnecessary to consider whether the merchandise is also a metallic mineral substance or a waste within the meaning of paragraphs 1664 and 1555, *supra*, respectively. Even were the court to find that the merchandise in addition to being an alloy used in the manufacture of iron was likewise a metallic mineral substance or a waste, paragraph 302 (o), *supra*, being a use provision, would prevail. *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T. D. 37611.

The imported commodity described on the commercial invoices as "Abrasive Sludge 81" having been found to be an alloy used in the manufacture of iron, not specially provided for, within the scope of paragraph 302 (o), Tariff Act of 1930, all claims of the plaintiff are overruled, without approving the collector's classification.

Judgment will be rendered accordingly.