UNITED STATES *v.* C. J. TOWER & SONS (No. 4693)[1]

United States Court of Customs and Patent Appeals, May 28, 1952

*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.
*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument April 8, 1952, by Mr. Donohue and Mr. Schwartz]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, and WORLEY, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, rendered pursuant to its decision, C. D. 1337, sustaining the protest of appellee, importer.

Merchandise, invoiced and entered as "Abrasive Sludge," imported from Canada and entered at the port of Buffalo, New York, was classified by the Collector of Customs as "Ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum" pursuant to the provisions of paragraph 302 (i) of the Tariff Act of 1930, as modified by the Canadian Trade Agreement (T. D. 49752) and assessed duty at the rate of one cent per pound on the silicon contained therein.

The importer protested this assessment claiming that the merchandise was properly free of duty, under paragraph 1664 of the Tariff Act

of 1930, as "Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for" or, alternately, to be dutiable at 7½ per centum ad valorem as "Waste, not specially provided for" as provided for under paragraph 1555 of the Tariff Act of 1930, as modified by the Canadian Trade Agreement, *supra.*

It was stipulated that the involved merchandise was similar in all respects to the merchandise involved in the case of *C. J. Tower & Sons* v. *United States*, 19 Cust. Ct. 46, C. D. 1066; that it was made in both cases by the same process and was used for the same purpose and, by agreement of the parties, the record and exhibits in the *Tower* case, *supra*, were received in evidence as a part of the record in the case at bar.

A description of the character of the merchandise and the manner of its production was set out in the *Tower* case, *supra*, and adopted by the trial court in the instant case. It reads as follows:

\* \* \* this so-called "Abrasive Sludge 81" is an unwanted byproduct resulting from the treatment of bauxite to produce an abrasive.

  \*    \*    \*    \*    \*    \*    \*

The aloxite electric furnace, as we operate it, is a metal shell on the bottom of which is placed a coke and tar bottom approximately fifteen inches thick. It's rammed in. The shell is iron, water cooled on the outside. The operation of the furnace is to feed in bauxite, establish an electric arc, two electrodes. The bauxite is melted with sufficient carbon there to reduce some of the impurities, such as iron oxide, silica, and a small amount of titanium oxide. These impurities when they are reduced, come out in the metallic state. These metals are heavier than the alumina, melted alumina bath settled out of the bath. This metallic material first reaching the carbon bottom through the settling, penetrates into the carbon bottom to the extent of possibly six inches. In other words, the carbon bottom acts as a sort of a sponge absorbing this material which is settling out.

After we have established this bottom consisting of these metals plus the carbon it becomes impervious and the remainder of the metallic material settles out as the furnace is filled up. This molten material collects on top of this bottom, metallized bottom, and forms what is ordinarily known as ferrosilicon. I'm not sure that's the correct term for it. We call it byproduct ferrosilicon. It's really a byproduct. The court then asked—

Judge Lawrence: What is the main thing you are trying to produce when this comes off as a byproduct?

The Witness: We're producing abrasives and we do not control this metallic material at all. It's absolutely a byproduct. We have no interest in it other than what little salvage we can get by selling it.

  \*    \*    \*    \*    \*    \*    \*

After the furnace is full of molten material the power is taken off and the bath is allowed to solidify. The furnace is then dumped and we have on the very bottom of this so-called pig ingot a layer of carbon which is formed, of course, from the coke which was originally put in. Just above that we have a layer of possibly three or six inches thick of this mixture of metallic material which has come down and been absorbed by the carbon. I haven't the analysis before me but I would say that the carbon in there might vary from something under

twenty percent to possibly over thirty percent. That's my recollection. The metallic material also varies very considerably in content from time to time. Above this so-called sludge is a layer of this by-product ferrosilicon which might be four to six inches thick, and above that is the aluminous abrasive material.

The record reflects the following analysis of the involved merchandise:

Silicon _____ 8. 92%
Iron _____ 57. 02%
Aluminum_____ 1. 85%
Titanium_____ 1. 30%
Phosphorus_____ 0. 34%
Carbon_____ 19. 0%
Aluminum oxide_____ 4. 62%
Remainder 6. 95% identity unknown, with the following important
     reservation:
 * * * that there are variations in the analysis of different shipments; that the carbon varies from slightly under 20 percent to over 30 percent; that the silicon content varies from about 6 percent to about 9 percent and that the other elements vary accordingly.

During the course of the taking of testimony in the *Tower* case, *supra,* and after the trial of that case had been transferred from Buffalo to New York City, Special Agents for the Government conducted an extensive investigation as to whether the involved merchandise was in fact ferrosilicon and they concluded that it was not. Thereupon, counsel for the Government stated that the merchandise had been improperly classified under subparagraph (i) of paragraph 302 of the Tariff Act of 1930 and claimed that the involved merchandise was properly dutiable under paragraph 302 (o) of that act which provides for "All alloys used in the manufacture of steel or iron, not specially provided for."

In the instant case it is also the contention of the Government that the involved merchandise falls within the purview of paragraph 302 (o) of the Tariff Act of 1930.

The trial court, in the case herein, sustained the protest of the importer, hence the issues before us are whether from the facts of record the commercial meaning of the word "alloys" differs from the ordinary meaning; and whether the involved sludge is free of duty as a "Metallic mineral substance in a crude state * * *."

The fundamental error is alleged by counsel for the Government to be the holding that the involved merchandise is not an alloy.

The importer introduced the testimony of four witnesses.

The first witness for appellee, Wilbur G. Wellings, stated that he had been employed by the Titanium Alloy Manufacturing Co. of Niagara Falls, New York, for 29 years; that this company was engaged in the manufacture of ferro alloys, ceramin materials, and industrial chemicals; that at the time of his retirement from the company in 1948 he was chief sales manager of the alloy division of the company

and also had the title of Chief Development Engineer in charge of the development of the uses of the alloys; that for nine years of the time of his employment he was connected with the Titanium Alloy Manufacturing Company Metallurgical Department and his duties were the investigating of the value of their alloys to the major number of commercial steels; that his duties entailed dealings with "Every major steel manufacturer in this country * * *," and the result of this work was a familiarity with the commercial meaning of the term "alloy" which he described as follows: "It means two or more elements, or two or more metals plus some oxides that has [sic] practical application and is manufactured to a definite specification." During the course of his testimony the witness was shown a sample of the involved merchandise, exhibit 1, and on being asked whether it is included within or excluded from the commercial meaning of the word "alloys," he replied "It is excluded from the commercial meaning of practical alloys or commercial alloys," and on being asked for his reasons for so replying he stated:

Well, in the first place, it contains as much as 19 to 30% carbon. By the addition of this material into a basic open hearth furnace, which is the receptacle that makes at least 75% of all steels in this country, the carbon content of this product would delay a heat possibly three or four hours to eliminate the carbon that would be practical in most commercial steels. Now, if you delay a heat of steel for that length of time, you are running into prohibitive costs. You couldn't possibly continue to be competitive.

The second witness for the importer was Charles H. Heist who testified that he was general manager of the Hanna Furnace Corporation of Buffalo, New York, which was engaged in the manufacture of pig-iron; that he had spent 40 years in the iron and steel industry, five years of that time in a pig-iron laboratory connected with a blast furnace operation; then with the Wisconsin Steel Corporation, a subsidiary of National Harvester Company of Chicago, as assistant chemist; then five years as chemist with the Federal Furnace Corporation in Chicago, which manufactured pig-iron; later with the Whittaker Glessner Steel Co. as assistant blast furnace superintendent; then the Youngstown Sheet and Tube Company of Youngstown, Ohio, as furnace superintendent in charge of eight blast furnaces, then manager of the entire operation. This company was engaged in the production of iron and steel products. Later the Limestone & Refractories Co. employed him as district sales manager of the Youngstown district. The business of that company "was serving steel, all the products that went to the open hearth." The witness further testified that the Hanna Furnace Corporation had purchased furnace sludge such as that represented by Exhibit 1; that it had been used under his direction in the plant; that "It is used as a raw material charged into the blast furnace as a raw material the same

as the iron ores or any other iron-bearing materials are charged into the blast furnace"; that Exhibit 1 was not an alloy but was a raw natural material; and that

It is absolutely excluded from a commercial alloy meaning because of the great variability of the elements. A commercial alloy—you've got to specify the exact amount of elements that you want in it. You've got no way to figure your charge. You've got no other way to figure your resultant metal.

On cross-examination Mr. Heist testified that the Hanna Furnace Corporation purchased merchandise such as that here involved as a raw material and that he had never known it to be bought, sold, or offered as an alloy.

The importer's third witness, Burnett P. Wiley, assistant secretary of the McKallum Bronze Co., which manufactured bronze castings in which alloys are used, stated that from 1909 to 1912 he was an "open hearth furnace man" for the Lackawanna Steel Company and after an absence of several years returned to that company and eventually became superintendent of the open-hearth furnace of that company until 1924; that during that time he was in charge of the use of raw material used; and that he was familiar with the commercial meaning of the term "alloy" which he defined as

An alloy, as we used it in manufacturing, was considered to be an intimate and uniform mixture of two or more metals or metals and non-metals prepared under very rigid specifications in order to impart certain desired properties to the metal.

George B. Mitchie, vice president in charge of sales of the Electro-refractories & Alloys Corporation of Buffalo, New York, was the fourth witness to testify for the importer. He stated he had been associated with that company since December 15, 1930, and from about 1926 or 1927 he was associated with the Niagara Falls Smelting & Refining Corporation; that the latter company manufactures special alloys for ferrous and non-ferrous fields; that he was familiar with the term "alloys" as used in the trade and commerce of the United States; and defined "alloy" as being "a mixture of two or more metals that are compounded deliberately to some predetermined specification for commercial use"; and that the meaning which he gave was uniform, definite, and general throughout the United States on and prior to June 17, 1930.

The testimony of these well-qualified witnesses clearly establishes that the word "alloy" had a well-known meaning throughout the United States which was uniform, definite, and general prior to and at the time of the passage of the Tariff Act of 1930.

The Government's first witness, J. E. Matkovick, a salesman for the Whitehead Metal Products Co., Inc., for approximately 10 years, testified that he personally sold the metal alloys that his company handled; that if he received an order for 10 tons of "alloys" he would

not know what to deliver if the order were not accompanied by qualifying words. On cross-examination the witness stated that the word "alloy" means "a mixture of two or more metals of *predetermined* analysis." (Italics ours.)

The Government's second witness, Herbert O. Jarvis, vice president of the Niagara Falls Smelting & Refining Division of Continental United Industries Co. stated that his company manufactured metals, metallic alloys, and metallurgical products such as fluxes and compounds; that prior to June 1930 his company was selling alloys in every state of the United States; that his definition of the word "alloy" was "It's a combination of two or more elements, one of which must be a metallic element"; that the term "alloy" did not have a general, definite, and uniform meaning different from its common meaning; and that if he received an order for 10 tons of alloys, he would ask the customer to submit specifications. On cross-examination the witness testified that "A commercial alloy is an alloy that is made to specification."

It is to be noted that the witnesses for the Government not only failed to rebut the testimony of the importer's witnesses but in effect corroborated it.

It is clear to us that commercial designation of the term "alloys" has been amply proved by well-qualified witnesses and that such designation differs from the common meaning of the term. Therefore, the judgment of the United States Customs Court is *affirmed.*