## ROBBINS *et al. v.* ROBERTSON, Collector.

*(Circuit Court, S. D. New York.* January 19, 1888.)

CUSTOMS DUTIES—CLASSIFICATION—STEEL ORNAMENTS.

Whether articles made of cut steel, steel, brass, copper, or mother of pearl, used as ornaments for belts, dresses, and sometimes for the hair, are dutiable as "manufactured articles not specifically provided for, composed wholly or in part of iron, steel," etc., or as "jewelry of all kinds," depends upon the meaning attached by the trade to the phrase "jewelry of all kinds," with reference to which congress is presumed to legislate in the tariff acts.

Action to Recover Back Customs Duties.

This was an action by Aaron S. Robbins and others to recover excess of duties paid on articles made of cut steel, of steel and brass, and of mother of pearl. They were of an ornamental character, were used to decorate belts, dresses, cloaks, hats, or bonnets, and were, in some instances, intended to be used as ornaments for the hair. They were described in the invoices by various names, such as "steel buckles," "steel ornaments," "steel cloak clasps," "steel daggers," "steel pins," "mock jewelry brooches," "mock jewelry ornaments," "steel hair-pins," "bonnet pins," "dress pins," "steel head-bands," "steel and pearl buckles," "mock jewelry buckles," etc. They were assessed for duty under paragraph 216 of the tariff act of 1883, as "manufactures, articles or wares, not specially enumerated or provided for in this act, composed wholly or in part of iron, steel, copper, lead, nickel, pewter, tin, zinc, gold, silver, platinum, or any other metal, and whether partly or wholly manufactured," and duty at the rate of 45 per cent. *ad valorem* exacted. The importer claimed that they were dutiable at 25 per cent. *ad valorem,* under paragraph 459, as "jewelry of all kinds."

*Hartley & Coleman,* for plaintiffs.

*Stephen A. Walker,* U. S. Atty., and *W. Wickham Smith,* Asst. U. S. Atty., for defendant.

LACOMBE, J., (*orally charging jury, after ruling upon the sufficiency of certain protests.*) In the earlier tariff acts of 1789, 1790, and 1794, duty was laid upon jewelry and paste work. In 1816 duty was exacted upon jewelry, precious stones, and pearls of all kinds, set or not set, Bristol stones, all paste work, all articles composed wholly or chiefly of gold, silver, etc. In the tariff act of 1842, August 30th, besides a duty upon gems, precious stones, and imitations thereof, there is laid a duty on jewelry composed of gold, silver, or platina, 20 per cent.; and on gilt, plated, or imitation jewelry, 25 per cent. In the act of 1846 there was a duty also laid on jewelry, real or imitation. At that time, you will perceive, congress had recognized that there existed a distinction between jewelry and imitations of jewelry; that there was such a thing as real jewelry; that there was such a thing as imitation jewelry. When, therefore, congress undertook to legislate in 1883 by passing the tariff act under which these goods in suit were entered, there existed here a statutory distinction between "jewelry real" and "jewelry imitation." In other words, it was recognized by the statutes that both classes of articles existed,—real jewelry and imitation jewelry. The act now before us, paragraph 459, lays a duty on "jewelry of all kinds, 25 per centum *ad valorum.*" In view of the fact that, when the act was passed, it was known to congress that a distinction between real and imitation jewelry as two different kinds of jewelry had been made for many years in tariff acts, it must be assumed that congress intended that all jewelry, the imitation jewelry as well as the real jewelry, should pay a duty of 25 per cent.

That brings us to the next question in the case: what is jewelry? The word "jewelry" is generally used as including articles of personal adornment, and the word further imports that the articles are of value in the community where they are used. A belt of cowry shells, a necklace of bears' claws, a head ornament of sharks' teeth, though possessing no value in themselves, are esteemed valuable in the communities where they are worn; and we, therefore, constantly find them referred to in books written in the English language,—books of travel, standard works, encyclopædias, and scientific dissertations upon sociology—we find those articles described in those books as "jewelry." The articles of value used for personal adornment in our civilization are, and for centuries have been, the precious metals,—gold and silver, to which, I think, platina is now generally added,—and what are known as precious stones,—the diamond, sapphire, ruby, etc. Articles manufactured from those for the purpose of personal adornment are known, as the witnesses on the stand told you, as articles of jewelry, and such testimony is accordant with your own knowledge as to what is the ordinary use of the term "jewelry."

We have found, however, that besides jewelry there is such a thing as imitation jewelry. Jewelry, of course, is an expensive article, and as many people desire to wear ornaments without being able to pay the price required for real jewelry, the manufacture and the use of imitation jewelry have come into existence. Now, what is an imitation piece of

jewelry? It need not necessarily be a counterfeit,—that is, it need not be an exact simulation of a particular article which it is intended to take the place of. If by a pleasing combination of appropriate materials, by an attractive arrangement of parts, an article is produced bearing a general resemblance to real jewelry ornaments, and suitable for similar uses, it may fairly be called imitation jewelry. Nor does the fact that the original jewelry of which it is an imitation has become obsolete prevent its being considered, in the ordinary use of the English language, as imitation jewelry. We all know from our reading that three or four hundred years ago articles of jewelry were used to ornament the head-gear, and to ornament the dress. If their use has entirely ceased to-day, that fact would not make articles now reproduced in imitation of them any the less imitation jewelry because real jewelry of the same kind is not now worn. If, therefore, we had to deal only with the ordinary use of the terms of the English language in disposing of this case, I should leave no question to you for your consideration. That, however, is not all that has to be determined in disposing of the cases brought under the tariff acts.

The tariff acts deal with the trade and commerce of this country. They are produced by congress upon elaborate and exhaustive investigations into the condition of that trade and commerce, and in full familiarity, we must assume, with the terms used in such trade and commerce. It is therefore a rule which has been laid down by the supreme court, in repeated decisions, that descriptive terms applied to articles of commerce shall be understood according to the acceptation given to them by commercial men in our own ports at the time of the passage of the act in which they are found. It matters not, therefore, here what may be the ordinary meaning of the words "imitation jewelry," or the ordinary meaning of the words "jewelry of all kinds," if you arrive at the conclusion, from the testimony introduced before you, that those words have in the trade and commerce of this country acquired a distinct meaning different from their ordinary meaning. If they have acquired such meaning, and these goods are not within the scope of that meaning, then they cannot be considered as jewelry, although, were it not for that custom of trade and system of trade nomenclature, they might be so considered. You perceive, therefore, that you will have to determine, from the evidence before you, first, whether there was any general, well-known, wide-spread meaning in trade and commerce—that is, in the trade and commerce that dealt in articles of jewelry and articles of this kind—which gave to the word "jewelry" a meaning different from what it had in ordinary language. If you arrive at the conclusion that there was some special trade definition of the word "jewelry," that dealers in the article always used it as meaning a particular kind of goods, then I charge you that congress must be assumed to have legislated with knowledge of that meaning, and that the word is used in the act in the same sense in which it is used in the trade. If you arrive at the conclusion that there is an existing trade meaning, you are then to determine whether

these articles, or any of them or all of them, are or are not within the definition of the word "jewelry" as you find it in the trade.

The jury found a verdict for the plaintiffs for $200.20 principal, $44.11 interest from the date of each payment; total, $244.31.