(C. D. 937)

## FUNG CHONG CO. v. UNITED STATES

United States Customs Court, Third Division

(Decided June 30, 1945)

*Harper & Harper (Lawrence A. Harper* and *Charles J. Evans* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is a suit against the United States arising at the port of San Francisco by protest against the collector's assessment of duty on kumquats imported from Hong Kong at 25 per centum under paragraph 752 of the Tariff Act of 1930. The merchandise is claimed to be properly dutiable at 1 cent per pound under paragraph 743.

Although the protest is against assessment of duty at 25 per centum under paragraph 752, at the trial and in the brief, counsel for plaintiff stated that duty had been assessed at 35 per centum. Item 51 on the invoice consists of "2 cases Dried Sweet Kumquat Orange in jar"; a red-ink notation thereon states "Candied fruit 752–25% AGP." Item 55 on the invoice consists of "10 cases Pres. Kumquat Orange in jar"; a red-ink notation thereon states "Prep. Fruit nspf." Upon the entry both items are entered under paragraph 752 at 35 per centum. The liquidation and duty statement groups all the items classified under the different rates and then totals the amount of duty. Therefore it cannot be ascertained whether the items were liquidated at 25 per centum or 35 per centum.

The pertinent provisions of the Tariff Act of 1930 are as follows:

PAR. 743. * * * oranges, 1 cent per pound; * * *.

PAR. 752. Fruits in their natural state, or in brine, pickled, dried, desiccated, evaporated, or otherwise prepared or preserved, and not specially provided for, and mixtures of two or more fruits, prepared or preserved, 35 per centum ad valorem: * * *.

A trade agreement with France (T. D. 48316) provides:

752 Candied, crystallized, or glace apricots, figs, dates, peaches, pears, plums, prunes, prunelles, berries and other fruits not specially provided for

25% ad val.

The issue is whether kumquats are dutiable as oranges. The same type of merchandise was before the court in *Quong Lee & Co. et al.* v. *United States*, 10 Cust. Ct. 23, C. D. 716. It was held that the kumquat was one of the varieties of oranges within the common meaning of that term and the merchandise was dutiable at 1 cent per pound under paragraph 743. The record in that case was put in evidence by the plaintiff in the instant case.

The Government admits that the common meaning of the term "oranges" includes kumquats, but claims that in the trade and commerce of the United States it has a meaning which does not include kumquats. The Government called a number of witnesses in San Francisco and in New York in an attempt to prove the commercial meaning.

The first witness was Samuel H. Kelly, manager for the California Fruit Growers Exchange, an organization which sells, markets, and distributes citrus fruits to jobbers in the United States and Canada. He testified that there was a difference between the common meaning of the term orange and the meaning of the term as used in the trade and commerce of the United States; that the commercial meaning was confined to the principal varieties produced in the United States; that the principal varieties in California were navel oranges and Valencia oranges; that there were other varieties produced in small quantities, such as Mediterranean sweets, Javas, Homosasas, seedlings, ruby bloods, and Malta bloods; that if he received an order for oranges, he would not fulfill it by sending kumquats. On cross-examination he testified:

X Q. Now, just to get this straight, to see if my notes are correct, navel oranges are November to May or June?—A. Yes.

X Q. Valencia oranges are April to November?—A. That is correct.

X Q. Suppose I ordered my oranges in May or April. What would I get?—A. Well, you would get ordinarily navels, because there would be greater volume at that time, but when there is an overlapping of seasons you would ask the jobber what he wanted, whether he wanted Valencias or navels.

X Q. So oranges in the trade and commerce do have a prefix?—A. Oh, yes, sure.

X Q. I mean they need the prefix to be identified?—A. Certainly.

The next witness was Joseph Moyes, president of Jacobs, Malcolm, and Burtt, a firm engaged in buying and selling fruits and produce on the Pacific Coast. He stated that the term "orange" had a meaning in trade and commerce different from its common meaning; that oranges were classed according to their different varieties, such as navels, Valencias, Mediterranean sweets, Homosasas, Parson Browns, Ruby and Malta bloods, Jaffas; that the term "orange" did not include kumquat. On cross-examination he testified that when customers wanted ruby bloods, they asked for ruby blood oranges; that there were other varieties grown in Florida that would be recognized as oranges on the Pacific Coast, but were not used there; that it is the common practice in all markets to refer to certain varieties of oranges as oranges; that a tangerine is not called an orange nor is a mandarin. He further testified:

X Q. In buying—if I sent you an order for oranges, what would you deliver to me?—A. It would all depend on the season of the year that you sent the order.

X Q. In May?—A. If you were an intelligent retailer or jobber and you sent an order in May, you would specify Valencia oranges or navel oranges.

X Q. But you say the trade has an understanding of the term oranges, as I understood it, so I am just using the understanding of the trade, oranges.—A. But the intelligent retailer will ask for Valencia or navels. He will not come in and ask simply for oranges. He will ask for Valencia oranges or navel oranges.

\*      .\*      \*      \*      \*      \*      .      \*

X Q. And orange itself as a term would not have an adequate or sufficient meaning to the trade?—A. Well, we wouldn't know, if a man came in and asked for oranges, we wouldn't know what variety he wanted unless he mentioned Valencias or navels, if the two varieties were in the market at the same time.

The case was transferred to New York and the Government called Frank J. Cuneo, president of G. B. Raffetto, Inc., manufacturers of fruit preserves and canned fruits. He testified that "orange" was a class of fruit; that there were many kinds of oranges; that kumquat was one of them; that he never used the term "orange" alone but asked for Valencia oranges or seedless oranges or kumquat oranges, depending upon the type orange he was interested in; that he never bought or sold oranges by the word "orange" alone except where the supplier happened to know what type he always ordered.

The next witness was Samuel Worthington Teague, division manager of the Florida Citrus Exchange, New York, a cooperative selling fruits of 5,000 citrus growers of Florida. He was asked what was known in the trade and commerce of the United States by the term "orange" and stated that oranges included Hamlins, Parson Browns, pineapples, seedlings, Valencias; that there are some 500 different varieties of oranges; that he sold oranges in Columbus, Ohio; Chicago, New York, and surrounding territory; that kumquats were not sold under the appellation of orange. On cross-examination he was asked

whether there was any general, definite, and uniform definition of the term "orange" in the trade and commerce of the United States—throughout the country—prior to June 1930, and replied that an orange was one of the types of citrus fruit, and on redirect elaborated that definition to a citrus fruit, round in shape and gold in color when ripe.

William W. Plummer, treasurer of a firm of fruit auctioneers selling to purchasers in the metropolitan district, stated that the term "orange" meant a round- or oval-shaped citrus fruit, orange in color, and edible in its original state; that there were many varieties of oranges, such as Hamlins, bloods, Valencias, navels; that a dozen or fifteen varieties might be sold at auction on one day.

E. O. Ramsey, assistant manager of the American Fruit Growers, New York Division, a sales organization selling fruit for 15,000 growers in the United States and Cuba, testified that he sold to buyers in the metropolitan area; that in 1930 he sold in the territory around Pittsburgh; that the term "orange" meant "a regular orange that you eat out of your hand or make juice out of"; that it did not include kumquat.

The last witness was Edo J. Schwitters, a dealer in fruits and vegetables, selling to the smaller man, to jobbers and semi-wholesalers. He stated that the term "orange" meant the ordinary regular orange that everyone knows; that the term "orange" did not cover kumquats.

It is well established in customs cases that the common and commercial meanings of a word are presumed to be the same unless it is otherwise shown; that the burden of proving commercial designation is upon the party who alleges it, and that commercial designation must be shown to be definite, uniform, and general throughout the United States at the time of the enactment of the tariff act. *Two Hundred Chests of Tea*, 22 U. S. (9 Wheat.) 428; *American Express Co.* v. *United States*, 10 Ct. Cust. Appls. 275, T. D. 38680; *United States* v. *Briggs Manufacturing Co.*, 14 Ct. Cust. Appls. 1, T. D. 41526; *Walter Johnson* v. *United States*, 21 C. C. P. A. (Customs) 129, T. D. 46464; *United States* v. *Armand Schwab & Co., Inc., et al.*, 30 C. C. P. A. (Customs) 72, C. A. D. 218. In the case last cited the court said (p. 78):

It is true, as stated by the trial court, that, unless it clearly appears to the contrary, tariff acts are to be construed according to the commercial understanding of the terms employed therein. It is equally true that it will be presumed that the common and commercial meaning of such terms are the same, and that in order to prove commercial designation it must be established that a tariff term has a meaning in the trade and commerce of the United States different from its common meaning and that such commercial meaning is definite, uniform, and general throughout the United States.

The method of proof of commercial designation has been well stated in *Passaic Worsted Co. et al.* v. *United States,* 17 C. C. P. A. (Customs) 459, T. D. 43916, as follows (pp. 461–462):

\* \* \* If, in the case at bar, it was sought to establish commercial designation of the imported machines as textile machinery, before attempting to do so it must be legally admitted that they have a commercial designation which differs from their common designation and that, under the common designation, they are not textile machinery. Otherwise, and if they are commonly known as textile machinery, no occasion for proof of commercial designation exists. Then, having admitted this necessary legal premise, the next inquiry must be: "By what name are these articles designated uniformly, generally, and definitely in the trade wherever they are bought and sold?" If, to such an inquiry, the witness can respond that they are so designated as textile machinery, the evidence is competent and tends to prove commercial designation. A very good and substantial reason exists for so directing the inquiry. If the witness is uncertain in his statement, such uncertainty will readily appear on cross-examination. If, on the other hand, the witness is asked whether a certain article belongs within a certain class, the answer he gives will simply be his opinion, and the true facts may not be readily available on cross-examination. The rule of commercial designation is a wise one, but the rule is narrow and must be closely adhered to.

In the instant case the witnesses Kelly and Moyes stated that the term "orange" had a commercial meaning different from its common meaning. However, both witnesses stated that apart from its commercial designation, they would not call a kumquat an orange, indicating that their understanding of the common meaning of "kumquat" was at variance with that held by the court in *Quong Lee & Co. et al.* v. *United States, supra,* and accepted by counsel for the Government. In defining the word "orange," some of the witnesses enumerated the varieties that are commercially included within the term, as follows:

KELLY: Navel, Valencia, Mediterranean sweet, Java, homosasa, seedling, ruby blood, Malta blood.

MOYES: Navel, Valencia, Mediterranean sweet, jaffa, homosasa, seedling, ruby blood, Malta blood, parson brown.

TEAGUE: Hamlin, parson brown, pineapple, seedling, Valencia, navel.

PLUMMER: Hamlin, blood, valencia, sweet, navel.

Witness Teague stated that there are 500 varieties of oranges and witness Plummer said there were many varieties and that a dozen or fifteen varieties might be sold at auction on one day. There was some testimony to the effect that if one ordered "oranges," he would receive the principal variety then on the market, but that was qualified later by statements that an intelligent jobber would indicate what variety of oranges he wanted. The witness Cuneo stated that he never ordered oranges without a descriptive prefix. A catalog of the New York Fruit Auction Corp., introduced into evidence as

illustrative exhibit A, lists oranges as follows: Valencia oranges, Washington navels, bloods, sweets, seedling, St. Mikes. Lemons, however, are listed merely as lemons. Witness Plummer stated that all of the auction sales were made with reference to the catalog.

Thus there does not seem to be any definite, uniform, and general commercial meaning of the term "orange" throughout the country. The testimony indicates that there are a great many varieties of oranges, possibly as many as five hundred, but the witnesses did not agree as to which are included commercially within the term "orange." Apparently a descriptive prefix was usually employed when oranges were ordered.

The witnesses were asked whether kumquats were ever included within the term "orange" and all of them except Mr. Cuneo stated that they were not. However, that method of questioning merely elicits the opinion of the witness, as is indicated in the *Passaic* case, *supra*. It does not establish a uniform definition.

Moreover, as plaintiff's brief points out, the witnesses did not testify as to a commercial meaning throughout the United States. The witnesses came from New York and San Francisco. The witness Kelly sold to the principal markets in the United States, such as Los Angeles, San Francisco, Portland, Seattle, Spokane, Butte, Salt Lake City, Denver, Des Moines, Minneapolis, Chicago, St. Louis, Kansas City, Baltimore, New York, Boston, Philadelphia, and Cincinnati. The others sold as follows: Moyes on the Pacific Coast; Teague in Columbus, Chicago, and New York; Plummer and Schwitters in the metropolitan area of New York, and Ramsey around Pittsburgh. Although some of the witnesses claimed that their organizations included a large number of the growers, there is nothing to indicate what proportion was represented. In *United States* v. *Sheepshearers Mdse. & Comm. Co.*, 20 C. C. P. A. (Customs) 327, T. D. 46112, the court refused to find commercial designation and therein commented on the fact that there was no proof of the proportion of the industry represented by the evidence.

We hold, therefore, that the Government has failed to prove that there is any commercial usage of the term "orange" unqualified by some prefix or that there is any definite, uniform, and general commercial meaning of the term "orange" throughout the United States. In accordance with the decision in *Quong Lee & Co. et al.* v. *United States, supra,* the protest is sustained insofar as it refers to kumquats and the collector is instructed to reliquidate accordingly. As to all other merchandise and in all other respects the protest is overruled.