(C. D. 1337)

C. J. TOWER & SONS v. UNITED STATES

United States Customs Court, Second Division

(Decided June 15, 1951)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett* and *Richard H. Welsh,* special attorneys), for the defendant.

Before LAWRENCE and FORD, Judges; RAO, J., not participating

LAWRENCE, Judge: A commodity described on the commercial invoice accompanying the entry herein as "Abrasive Sludge 81" and imported from Canada was classified by the collector of customs as "Ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum" within the provisions of paragraph 302 (i) of the Tariff Act of 1930 (19 U. S. C. §1001, par. 302 (i)), as modified by the trade agreement between the United States and Canada (74 Treas. Dec. 235, T. D. 49752), and duty was accordingly assessed thereon at the rate of 1 cent per pound on the silicon contained therein.

Plaintiff contends that the merchandise is properly free of duty pursuant to the provision in paragraph 1664 of said act (19 U. S. C. § 1201, par. 1664) as "Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for," or dutiable at 7½ per centum ad valorem as "Waste, not specially provided for" within the scope of paragraph 1555 of said act (19 U. S. C. § 1001, par. 1555), as modified by the Canadian Trade Agreement, *supra.*

At the trial it was stipulated by the parties that the importation above referred to is the same in all material respects as the merchandise

involved in the case of *C. J. Tower & Sons* v. *United States*, 19 Cust. Ct. 46, C. D. 1066, and that the merchandise in both cases was made by the same process, by the same manufacturer, and was used for the same purpose; and, by agreement of the parties, the record (including the exhibits) in the *Tower* case, *supra*, was received in evidence as a part of the record herein.

In our opinion in the *Tower* case, *supra*, we remarked, in part:

When the case was subsequently called for hearing at New York, counsel for the United States stated that an extensive investigation had been conducted by special agents and that "As a result of that investigation, the special agent and myself have reached the conclusion that the merchandise is not ferrosilicon; that it was improperly classified and, we concede that it is not properly dutiable as ferrosilicon."

Commenting upon that concession, we said:

From an examination of the record we are of the opinion that said merchandise is not, in fact, ferrosilicon within the contemplation of paragraph 302 (i), *supra*, and that the Government properly made that concession.

As in the former case, the Government contends that the commodity under consideration should be classified within the provision in paragraph 302 (o) of said act for "All alloys used in the manufacture of steel or iron, not specially provided for,  *  *  *", and subjected to duty at the rate of 25 per centum ad valorem.

In our opinion in the *Tower* case, *supra*, we pointed out that—

It appears from the record that this so-called "Abrasive Sludge 81" is an unwanted byproduct resulting from the treatment of bauxite to produce an abrasive. *  *  *

To quote further, we said:

*  *  *  The process is described by one of the witnesses as follows:

The aloxite electric furnace, as we operate it, is a metal shell on the bottom of which is placed a coke and tar bottom approximately fifteen inches thick. It's rammed in. The shell is iron, water cooled on the outside. The operation of the furnace is to feed in bauxite, establish an electric arc, two electrodes. The bauxite is melted with sufficient carbon there to reduce some of the impurities, such as iron oxide, silica, and a small amount of titanium oxide. These impurities when they are reduced, come out in the metallic state. These metals are heavier than the alumina, melted alumina bath settled out of the bath. This metallic material first reaching the carbon bottom through the settling, penetrates into the carbon bottom to the extent of possibly six inches. In other words, the carbon bottom acts as a sort of a sponge absorbing this material which is settling out.

After we have established this bottom consisting of these metals plus the carbon it becomes impervious and the remainder of the metallic material settles out as the furnace is filled up. This molten material collects on top of this bottom, metalized bottom, and forms what is ordinarily known as ferrosilicon. I'm not sure that's the correct term for it. We call it byproduct ferrosilicon. It's really a byproduct.

The court then asked—

> JUDGE LAWRENCE: What is the main thing you are trying to produce when this comes off as a byproduct?

> THE WITNESS: We're producing abrasives and we do not control this metallic material at all. It's absolutely a byproduct. We have no interest in it other than what little salvage we can get by selling it.

Our opinion then proceeds as follows:

After a sample of byproduct ferrosilicon was introduced into evidence and marked "Plaintiff's Illustrative Exhibit A," the witness continued his description of the method of producing the product, exhibit 1, here in issue, as follows:

> After the furnace is full of molten material the power is taken off and the bath is allowed to solidify. The furnace is then dumped and we have on the very bottom of this so-called pig ingot a layer of carbon which is formed, of course, from the coke which was originally put in. Just above that we have a layer of possibly three or six inches thick of this mixture of metallic material which has come down and been absorbed by the carbon. I haven't the analysis before me but I would say that the carbon in there might vary from something under twenty percent to possibly over thirty percent. That's my recollection. The metallic material also varies very considerably in content from time to time. Above this so-called sludge is a layer of this by-product ferrosilicon which might be four to six inches thick, and above that is the aluminous abrasive material.

and added that this so-called sludge is sometimes called furnace sludge or abrasive sludge.

An analysis of the merchandise represented by exhibit 1 in the incorporated case is as follows:

Silicon _____ 8.92%
Iron _____ 57.02%
Aluminum _____ 1.85%
Titanium _____ 1.30%
Phosphorus _____ 0.34%
Carbon _____ 19.0%
Aluminum oxide _____ 4.62%
Remainder _____ 6.95% identity unknown,

with the following important reservation:

> * * * that there are variations in the analysis of different shipments; that the carbon varies from slightly under 20 percent to over 30 percent; that the silicon content varies from about 6 percent to about 9 percent and that the other elements vary accordingly.

After reviewing the evidence of the witnesses in that case, we said:

Since there has been no attempt to establish a commercial meaning for the term "alloy" different from its common meaning, the word as used in the statute must be given its ordinary meaning. * * *

Based upon the record in that case, and aided by references to various lexicographic and other standard authorities upon the subject of alloys, we found that the material in controversy conformed to the common meaning of the word "alloy" and that it was used in the

manufacture of iron. Accordingly, we held that it should be classified in paragraph 302 (o), *supra*, which enumerates "All alloys used in the manufacture of steel or iron, not specially provided for, * * *." However, that claim not having been invoked by plaintiff, its protest was overruled without approving the collector's classification.

In the instant case, plaintiff contends that it has been established that the term "alloys," as employed in paragraph 302, *supra*, has a uniform, definite, and restricted commercial meaning differing from the common meaning and that as commercially understood the imported product under consideration would be excluded from that classification.

As the commercial meaning of a term used in the tariff act is a question of fact which, like any other, must be proved by the weight of competent evidence (*Seeberger* v. *Schlesinger*, 152 U. S. 581), it becomes necessary to analyze the record and weigh the evidence designed to establish the commercial meaning of the term "alloys" as used in paragraph 302 (o), *supra*. Upon this phase of the case, it is important to review only the testimony taken in the present controversy, protest 117353-K, inasmuch as no effort was made to establish commercial designation in the incorporated case (protest 116229-K). Upon the subject of commercial designation, plaintiff called four witnesses, while the defendant presented two.

Plaintiff's first witness, Wilbur G. Wellings, testified that after being employed by the Titanium Alloy Manufacturing Co. of Niagara Falls, N. Y., for 29 years, he retired in 1948; that the business of that company was the manufacture of ferro alloys, ceramic materials, and industrial chemicals; that by the term "ferro alloys" he meant "chiefly titanium-bearing alloys." At the time of his retirement Mr. Wellings was chief sales manager of the alloy division of his company; he also had the title of chief development engineer, in charge of the development of uses for the alloys; and he traveled for about 20 years, from 1928 to 1948, selling alloys everywhere in the United States where there was a steel plant. The witness testified that between 1919 and 1928 "I was connected with the Titanium Alloy Manufacturing Company Metallurgical Department. My duties were, at that time, investigating the value of our alloys to the major number of commercial steels"; that in selling the alloys which his company manufactured, he dealt with "Every major steel manufacturer in this country," in carload lots; that as a result of this experience, he became familiar with the commercial meaning of the term "alloys" on and prior to June 17, 1930, which he described as follows: "It means two or more elements, or two or more metals plus some oxides that has practical application and is manufactured to a definite specification." Further, the witness testified:

Q. Is the definition which you have just given based upon your commercial experience in the alloy business?—A. Yes, it is my experience, and I believe every steel-makers' experience.

Q. Was that commercial definition which you have just given definite, uniform, and general throughout the United States within your experience?—A. Yes, sir.

Q. On and prior to June 17, 1930?—A. That's right, sir.

The witness was then shown exhibit 1, consisting of representative samples of the furnace sludge with which we are here concerned, and after it was explained to the witness, based upon the record in the incorporated case, that the article was a byproduct or residue obtained in the manufacture of aluminous abrasives in an electric furnace and having the analysis above set forth; that there are variations in the analysis of different shipments; that the carbon varies from slightly under 20 per centum to over 30 per centum; that the silicon content varies from about 6 per centum to about 9 per centum; and that the other elements vary accordingly, he was asked whether said exhibit 1 is included within or excluded from the commercial meaning of the word "alloys," as defined by him, to which he replied, "It is excluded from the commercial meaning of practical alloys or commercial alloys." When asked to explain why it was excluded from the commercial meaning of the term "alloys," the witness replied, "Well, in the first place, it contains as much as 19 to 30% of carbon. By the addition of this material into a basic open hearth furnace, which is the receptacle that makes at least 75% of all steels in this country, the carbon content of this product would delay a heat possibly three or four hours to eliminate the carbon that would be practical in most commercial steels. Now, if you delay a heat of steel for that length of time, you are running into prohibitive costs. You couldn't possibly continue to be competitive." The witness further testified, in substance, that he had never known of material such as exhibit 1 to be offered, bought, or sold as an alloy.

Plaintiff's second witness, Charles H. Heist, testified that he was general manager of the Hanna Furnace Corp. of Buffalo, N. Y., engaged in the manufacture of pig iron; that he had been in the iron and steel industry about 40 years, having spent 5 years of that time in a pig-iron laboratory connected with a blast-furnace operation; later, he was assistant chemist with the Wisconsin Steel Corp., a subsidiary of National Harvester Co. in Chicago, which manufactured pig iron and steel; after that, he was engaged for 5 years as chemist with the Federal Furnace Corp. in Chicago, manufacturer of pig iron; then he went to Portsmouth, Ohio, with the Whittaker Glessner Steel Co. as assistant blast furnace superintendent. That company also manufactured pig iron and steel. In the latter part of 1919, he became blast furnace superintendent, and after 2 years, became assistant

manager and later manager, "and then to the Youngstown Sheet & Tube Company in 1928 at Youngstown, Ohio, * * * for the first nine months I was blast furnace superintendent in charge of eight blast furnaces and after that I was manager of the entire operation" engaged in the production of iron and steel products. In 1935, he began a 5-year period of employment with the Limestone & Refractories Co. as district sales manager of the Youngstown district. The business of that company "was serving steel, all the products that went to the open hearth. And then I came to this present position in 1941."

The witness stated that he had used alloys "All through my steel experience"; that the Youngstown Sheet & Tube Co. used alloys in manufacturing steel under his supervision; that said alloys were purchased "Under some of my specifications"; that while he did not buy them personally and did not specify them on all occasions, he was, by reason of his position, familiar with the alloys which were bought; that as a result of his experience, he was familiar with the commercial meaning of the term "alloys" in trade and commerce of the United States on and prior to June 17, 1930, which he defined as follows:

Well, it is a mixture of two or more metals, metals and non-metals, that have been specially prepared for a specific purpose to be used in the manufacture of iron and steel or any other metal.

which he believed to be a definite, uniform, and generally known commercial meaning.

Witness Heist testified that the Hanna Furnace Corp., of which he was general manager, had purchased furnace sludge represented by exhibit 1, which was used under his direction at that plant; "It is used as a raw material charged into the blast furnace as a raw material the same as the iron ores or any other iron-bearing materials are charged into the blast furnace." When asked if it was used as an alloy, he replied, "No, it is a raw natural material." He then explained in detail why it was not used as an alloy. When it was stated to the witness, based upon the record in the incorporated case, that exhibit 1 was a byproduct or residue in the manufacture of aluminous abrasives in an electric furnace and that it showed, upon analysis, the results stated earlier in this opinion, he was asked whether exhibit 1 falls within or is excluded from the commercial meaning of "alloys," as defined by him, to which he answered:

It is absolutely excluded from a commercial alloy meaning because of the great variability of the elements. A commercial alloy—you've got to specify the exact amount of elements that you want in it. You've got no way to figure your charge. You've got no other way to figure your resultant metal.

and further:

Q. Do you mean because an alloy is prepared for a specific purpose?—A. Yes, it is prepared for a specific purpose, a specific analysis; that is, a commercial alloy.

On cross-examination, Mr. Heist was asked if, in purchasing merchandise such as exhibit 1, "did the Hanna Furnace Corporation order on a specification and specify the elements which they desired in the product?"—to which he replied, "No, they did not. They purchased it as a raw material. Of course, they purchased it with the analyses that were submitted to us which contained approximately—it would vary anywhere from 65 to 75 or 80% of Fe." The witness further pointed out that while it was purchased upon analyses submitted to the purchaser, the purchaser, on the other hand, did not specify any particular analyses.

The witness testified that in his experience there were 10 or 12 commercial alloys used in the steel industry; that none was used in the iron industry. When asked on redirect examination whether, in his entire experience, he had ever known material such as exhibit 1 to be bought, sold, or offered as an alloy, he answered, "Never."

Plaintiff's third witness, Burnett P. Wiley, testified that he was assistant secretary of the McKallum Bronze Co., which manufactures bronze castings in which alloys are used; that he had personally bought alloys for his company. In relating his experience in the metal and steel industry, he stated that in 1909 he was engaged for 6 months as a routine chemist with the Lackawanna Steel Co. at Lackawanna, N. Y., and "Then I went out on the floor as an open hearth furnace man" for the same company from 1909 to 1912, explaining that he "operated the furnace and made the steel, and prepared the heat, melted it, and regulated the gas," producing open-hearth steel; that alloys were used in the process. After an absence of several years, the witness returned in 1917 to the same company, in the same department, as night superintendent, having charge of the operation of the department, manufacturing steel, and transporting it to the various rolling mills. He then became superintendent of the open-hearth furnace of Lackawanna Steel Co., which was later absorbed by Bethlehem Steel Co., and that 14 open-hearth furnaces were under his direction and supervision until 1924.

From 1917 to 1924, when the witness was superintendent of the open-hearth department of the Lackawanna Steel Co., he was in charge of the use of raw materials employed, although he did not do the actual purchasing. However, as supplies were needed, he would contact the purchasing department and designate what he desired, or contact the general superintendent of the plant, who, in turn, would issue the orders to the purchasing department; that while he did not "write out and formally sign any requisition for them, * * * I would notify the purchasing department that we wanted a certain ferro-manganese or ferro-phosphorous, or something of that sort"; that he became familiar with some, but not all, of the commercial alloys.

Based upon his experience with Lackawanna Steel Co. prior to 1924, and with the McKallum Bronze Co., he testified that he was familiar with the commercial meaning of the term "alloy," as used in the trade and commerce of the United States, which he defined as follows:

An alloy, as we used it in manufacturing, was considered to be an intimate and uniform mixture of two or more metals or metals and non-metals prepared under very rigid specifications in order to impart certain desired properties to the metal.

which meaning was definite, uniform, and general.

Referring to the incorporated record, it was explained to the witness that exhibit 1 is obtained as a byproduct in the manufacture of aluminous abrasives in an electric furnace, is used as a part of the furnace burden in the manufacture of silvery pig iron in a blast furnace, and has the analysis described earlier in this opinion. He was then asked whether exhibit 1 would fall within or be excluded from the commercial meaning of "alloys," as defined by him, to which he replied "Excluded from," stating that "it doesn't conform to my conception, as I tried to state before, of an alloy being an intimate and uniform mixture of two or more metals or metals and non-metals prepared to definite rigid specifications."

On cross-examination, the witness testified that, while he had supervision over requisitions for alloys purchased by his company, he did not specify the formula for each particular alloy "because we were accustomed to constantly using a certain type of alloy which we expected to use and use again"; that it purchased somewhere between 10 and 15 types of alloys; that each one had a definite analysis, with which he was familiar, and that in making a requisition, he would indicate that he "wanted another carload of 15% ferro-phosphorous or ferro-manganese." The witness admitted that an order for "alloys" could not be filled without some qualifying words to indicate the particular alloy needed.

Plaintiff's fourth witness, George B. Mitchie, testified that he was vice president in charge of sales of the Electrorefractories & Alloys Corp., of Buffalo, N. Y., with which he had been associated since December 15, 1930; that the company manufactures Tercod crucibles, silicon carbide, and aluminum oxide superrefractories, high-temperature cements, stopper heads, resin-bonded grinding wheels, and special nonferrous alloys; that he sold the alloys manufactured by his company to customers throughout the whole United States, selling principally to manufacturers of nonferrous castings, and also, "we have one or two alloys used in the gray iron foundries in the case iron field," these alloys being composed of nickel, silicon, and another composition of nickel, iron, and chrome. It also appears from Mr. Mitchie's testimony that he manufactures both nonferrous and ferrous alloys. In outlining his duties with the Electrorefractories & Alloys Corp. since December 15, 1940, the witness stated:

Originally I was in charge of the manufacture of the alloys. Prior to that our company did not manufacture alloys and I started that branch for them. During the war I also took care of the purchases of all of our materials, raw materials, and otherwise during the wartime period, priorities, and I took over the sales—charge of sales about three and a half years ago.

Q. Did you do any selling before that time?—A. Oh, yes, but not for this company.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Now, before December 15, 1930, with what company were you connected?—A. Niagara Falls Smelting & Refining Corporation.

Q. When did you join them?—A. '26 or '27. I don't recall exactly.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. And you stayed with them until about December 15, 1930?—A. That's right.

He testified that the Niagara Falls Smelting & Refining Corp. manufactures special alloys both for ferrous and nonferrous fields; that he was field salesman, selling to the trade throughout Illinois, Indiana, Iowa, Minnesota, and Wisconsin, dealing mainly with consumers who were operating ferrous and nonferrous foundries; that previous thereto, he was with Alloys & Products, Inc., of New York, who also manufactured alloys, being in charge of the manufacturing end of the business. He also testified to his experience in the metallurgical department of the International Motor Co. in New Brunswick, N. J., "doing metallurgical control work on the alloys used in connection with the iron, brass, and aluminum foundries. &ast; &ast; &ast; controlled the mixtures and specifications."

Referring to the period when the witness was selling alloys for the Niagara Falls Smelting & Refining Corp., he testified that he became familiar with the name "alloys," as used in the trade and commerce of the United States; that he knew the meaning of the term even prior to that time. He defined "alloy" as being "a mixture of two or more metals that are compounded deliberately to some predetermined specification for commercial use"; that "in some cases it would be non-metals, if you consider carbon a non-metal, yes, but to all intents and purposes, we generally consider it two or more metals"; that the meaning which he gave was uniform, definite, and general throughout the United States on and prior to June 17, 1930.

We have explored the testimony of these four witnesses at considerable length to demonstrate their breadth of knowledge and wide experience in the metallurgical field, their familiarity with the technology of the steel industry, and particularly with alloys and their uses in trade and commerce. In evaluating the importance of the testimony of the witnesses above referred to, it should be borne in mind that there is no presumption in favor of official action to be overcome, since it has been conceded by defendant that the collector's classification of the commodity under consideration was

incorrect and we so hold on the basis of the incorporated record (C. D. 1066, *supra*).

The testimony of the four witnesses above referred to, unless successfully rebutted, establishes that the word "alloys" had a well-known meaning in the trade and commerce of the United States which was uniform, definite, and general prior to the passage of the Tariff Act of 1930 and which they all agreed, in substance, was as follows:

An intimate and uniform mixture of two or more metals or metals and nonmetals definitely manufactured to rigid specifications.

Implicit in the definition as disclosed by the record is the fact that the admixture of metals or of metals and nonmetals is deliberately compounded in accordance with predetermined specifications for commercial use. The imported commodity, however, differs from commercial alloys in that it is an adventitious mixture which occurs as an unwanted byproduct in the treatment of bauxite to produce an abrasive, and has a variable composition.

The defendant called two witnesses, whose testimony on the whole not only failed to contradict that of plaintiff's witnesses but, on the contrary, strongly tends to support it.

Defendant's first witness, J. E. Matkovick, testified that he had been connected with the Whitehead Metal Products Co., Inc., for 19 years and for approximately 10 years—up to the time he appeared as a witness herein—he had been engaged as a salesman for his company; that he personally sold the metal alloys that his company handled as jobbers throughout the so-called "Southern Tier," and that he sold "around 150,000 pounds" per year. The witness stated that he first began to sell alloys "the latter part of 1930" and, when asked if the term "alloy" had any general, definite, and uniform meaning in the trade different from its common meaning, objection was made by plaintiff that the witness was not qualified to answer the question because he had not dealt in or sold alloys on and prior to June 17, 1930. Defendant maintained that since "this merchandise was not imported in 1930" (having reference to the commodity under consideration), it was not necessary that the witness should have had selling experience prior to the passage of the Tariff Act on June 17, 1930. Upon the objection being overruled, the witness answered, "No."

The witness further stated that if he received an order for 10 tons of "alloys," he would not know what to deliver if the order were unaccompanied by qualifying words. Through this witness, a booklet, referred to as "Stock List No. 15" of the Whitehead Metal Products Co., Inc., was introduced in evidence as illustrative exhibit A, in which various alloys, among other things, are listed.

On cross-examination, the witness testified that he bought alloys from the American Brass Co., the International Nickel Co., and the Aluminum Co. of America in the form of rods—"rounds, flats, hexagons, and in sheet form, tubular form. * * * We specify the particular type of alloy that we are buying. * * * 'Alloy,' in itself, does not mean anything." This statement was subsequently modified, however, as indicated in the following testimony:

X Q. In other words, you would want to know the particular kind of alloy that is intended; is that right?—A. That's right.

X Q. But you wouldn't say that the word "alloy" doesn't mean anything, would you?—A. Not in that sense; no.

X Q. It does have a definite meaning, doesn't it?—A. Yes.

* * * * * * *

X Q. Well, now, what does the word "alloy" mean to you?—A. To me it is a mixture of two or more metals of predetermined analyses.

X Q. And that predetermined analyses [sic] is important, isn't that right?—A. That's right.

X Q. Because an alloy does a specific job, isn't that so?—A. That's right.

X Q. And it is created to do a specific job, isn't it?—A. Yes.

X Q. And that is what the term alloy means to you and in the commerce of the United States; isn't that right?—A. Yes.

X Q. Based upon your commercial experience?—A. Yes.

X Q. But when a man orders an alloy, or sells an alloy, he naturally has to specify the particular kind of alloy that he is buying or selling, or offering, isn't that right?—A. That's right.

X Q. Now, you wouldn't say that an alloy is limited to a mixture of metals, would you? Aren't there alloys that are mixtures of metals and non-metals?—A. Yes, I guess there are.

X Q. So that the term is not limited to a mixture of metals only; isn't that so?—A. That's right.

X Q. Wouldn't you say that in the commerce of the United States, so far as your experience goes, an alloy is a mixture of two or more metals, or of two or more metals and non-metals deliberately prepared to specification for the purpose of imparting specific properties to other metals?—A. Yes.

Defendant's second witness, Herbert O. Jarvis, testified that since 1944 he had been vice president of the Niagara Falls Smelting & Refining Division of Continental United Industries Co.; that from 1935 to 1944, he was general manager of the division; that prior to that time he had various duties such as metallurgist, plant manager, and chemist; that he had "dealt in selling the company's products in one capacity or another" since the early part of 1930, the products consisting of metals, metallic alloys, and various other metallurgical products such as fluxes and compounds; that their sales were throughout the United States to smelters or consumers. When interrogated as to the common meaning of the term "alloy," he replied, "It's a combination of two or more elements, one of which must be a metallic element." When asked if the term "alloys" had any general,

definite, and uniform meaning in the iron and steel trade different from its common meaning, he answered, "No." The witness testified that an order for "10 tons of alloys" would not be filled without asking the customer to submit specifications because his company manufactures hundreds of alloys. He produced a booklet entitled "Facts For Foundrymen" by Ernest G. Jarvis and Herbert O. Jarvis, Sixth Edition—the witness being one of the authors—which he identified as a book circulated by his company throughout the metal trade "for the instruction of people who are interested in the use of alloys and metals." This was received in evidence as illustrative exhibit B.

On cross-examination, after wavering considerably as to the common or commercial meaning of the term "alloys," he finally admitted that "A commercial alloy is an alloy that is made to specification" and that all of the alloys manufactured by his company are made according to specification "So that we can deliver a uniform product to the customer each time he buys or purchases the same alloy." When asked if he knew of any alloys "that are prepared by accident," the witness replied, "We do occasionally in certain processes, but they are not for sale. * * * They are for re-use, but they are not for sale"; that in running a smelting plant, residual metals produced from drosses which might come off from a previous smelting process are sometimes used, "and the fact that you do not know the composition at the time of purchase is immaterial because it is later determined by analysis and assay, the fact that you do not know the composition of it when it is purchased does not mean that it is not an alloy"—in a technical sense. The witness also testified that there are certain drosses or skimmings which come off the pot containing manganese-copper, which it may not be considered economically sound to reprocess, that can be sold as residues; that while drosses and residues may be alloys in a sense, they are not sold as alloys.

We do not find that the testimony of the two witnesses introduced by defendant with respect to the commercial meaning of the term "alloys" conflicts in any vital respect with the testimony of the four witnesses for the plaintiff. At the trial and in the brief of defendant, the principal contention seems to be that because an order for a certain quantity of alloys without words of description could not be intelligently filled by a merchant, the term "alloys" is therefore meaningless. It is clear to us that the term "alloys" is the designation of a class or kind of merchandise which, according to the witnesses, is the result of a combination of metals or of metals and nonmetals conforming to certain predetermined specifications, and it is natural that in the purchase and sale of alloys one must indicate the type desired.

Addressing our attention now to the law applicable to the facts before us, it is fundamental that Congress, in drafting customs tariff

laws, is presumed to classify merchandise according to the general usages and known denominations of trade. *200 Chests of Tea*, 22 U.S. (9 Wheat.) 189.

Many years ago, Judge Lacombe, a jurist of great distinction, sitting in the Circuit Court, S. D. New York, in *Robbins et al.* v. *Robertson, Collector*, 33 Fed. 709, in orally charging the jury, stated in part:

> The tariff acts deal with the trade and commerce of this country. They are produced by congress upon elaborate and exhaustive investigations into the condition of that trade and commerce, and in full familiarity, we must assume, with the terms used in such trade and commerce. It is therefore a rule which has been laid down by the supreme court, in repeated decisions, that descriptive terms applied to articles of commerce shall be understood according to the acceptation given to them by commercial men in our own ports at the time of the passage of the act in which they are found.

In that case the question was presented whether certain articles made of cut steel, of steel and brass, and of mother-of-pearl, which were of an ornamental character and used to decorate belts, dresses, cloaks, hats, or bonnets, and, in some instances, as ornaments for the hair, and known by various specific names such as "steel buckles," "steel ornaments," "steel cloak clasps," "steel daggers," "steel pins," and so forth, should be classified in the Tariff Act of 1883 as articles or wares not specially provided for, composed in part of metal, or whether they should be classified for duty within the provision for "jewelry of all kinds." Further, in his charge to the jury, the learned judge observed:

> * * * It matters not, therefore, here what may be the ordinary meaning of the words "imitation jewelry," or the ordinary meaning of the words "jewelry of all kinds," if you arrive at the conclusion, from the testimony introduced before you, that those words have in the trade and commerce of this country acquired a distinct meaning different from their ordinary meaning. * * * If you arrive at the conclusion that there was some special trade definition of the word "jewelry," that dealers in the article always used it as meaning a particular kind of goods, then I charge you that congress must be assumed to have legislated with knowledge of that meaning, and that the word is used in the act in the same sense in which it is used in the trade.

Continuing, the judge charged:

> * * * If you arrive at the conclusion that there is an existing trade meaning, you are then to determine whether these articles, or any of them or all of them, are or are not within the definition of the word "jewelry" as you find it in the trade.

The report of the case discloses that the jury found a verdict for the plaintiffs, which, of course, signifies that the jury reached the conclusion that the articles in that case, bearing various names, were within the trade definition of the word "jewelry."

Obviously, an order for "jewelry," like an order for "alloys," without words of qualification or description would be meaningless, but that does not derogate from.the fact that the terms "jewelry" and "alloys" imply a variety of articles of a class or kind which are known to the trade and commerce as jewelry or as alloys, respectively.

The *Robbins* case, *supra*, was cited with apparent approval by the Circuit Court of Appeals in the case of *In re Herrman et al.*, 2 Cir., 56 Fed. 477. The court was there considering the dutiable classification of so-called "Astrachans," being fabrics composed of cotton and hair, made in imitation of the coat of the astrakhan lamb, and one of the questions presented was whether said fabrics were or were not "pile fabrics" within the commercial sense of that term. While it was recognized in that case that the term "pile fabrics" was used in trade to designate a group of goods, it was held that on the evidence in the case the importations there under consideration were not of the class commercially known by the generic name of "pile fabrics." The court made it clear that it was not important that the term was not one by which any fabrics were bought and sold, stating that:

A descriptive term found in a tariff act may have a commercial meaning which differs from the ordinary meaning, notwithstanding it is not used in trade as a specific designation by which any article or product is bought and sold.

In *Pickhardt* v. *Merritt*, 132 U. S. 252, it was *claimed* that a tariff provision for "aniline dyes and colors, by whatever name known" was a descriptive and not a commercial term and, therefore, that evidence of commercial designation was not admissible. The Court *held*, however, that proof of commercial designation was applicable even though the article in question was unknown when the statute was enacted.

In *Cadwalader* v. *Zeh*, 151 U. S. 171, the Court, in discussing the subject of commercial designation, used the following language:

* * * It has long been a settled rule of interpretation of the statutes imposing duties on imports, that if words used therein to designate particular kinds or classes of goods have a well known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention; and that it is only when no commercial meaning is called for or proved, that the common meaning of the words is to be adopted. * * *

The Court was there concerned with the classification of certain articles of earthenware consisting of small cups, saucers, mugs, and plates 5 or 6 inches in diameter, having upon them pictures of animals and of other objects, and letters of the alphabet, and which the importer there contended should be classified for duty within a provision in the Tariff Act of 1883 for "dolls and toys," rather than in a provision for "china, porcelain, parian and bisque, earthen, stone and crockery ware," and so forth.

It appears that the trial court had instructed the jury, among other things:

* * * that the signification of the term "toys," in common speech, embraces only such things as are primarily intended for the entertainment and amusement of children; that "the term 'toys,' used in the statute, is to receive the signification ordinarily attributed to it in common speech, unless the evidence shows that it has a different trade signification, that is, that it is differently used and understood when applied to such merchandise by those engaged in commerce respecting it, and had such different signification at the date of the statute in 1883;" that, if it had such different signification in trade and commerce, the statute must be understood as using the term in that sense; that the evidence seemed to put beyond doubt that the term had a well understood trade signification, inasmuch as the witnesses on both sides testified that at and before the date of the statute it was in common use among those engaged in this branch of commerce, and differed only as respected the scope of its application; and concluded the instructions to the jury as follows: "If you find that the term in question has a well known trade signification, (had at the date of the statute,) and that these articles fall within it, your verdict must be for the plaintiff, no matter whether the trade designation seems to you to be reasonable or not. If you do not so find, your verdict must be for the defendant."

In the Supreme Court of the United States, the principal exception of the defendant was to those instructions. After reviewing numerous cases upon the subject of commercial designation, the Court expressed itself as follows:

No reason is shown for taking the present case out of the general rule. The tariff act of 1883 contains nothing from which it can be inferred that the word "toys" is used therein in any other than its commercial meaning. At the trial the witnesses on both sides testified that there was a class of earthenware goods commonly known in trade and commerce as toys. They differed, indeed, upon the question whether these articles came within that class; the plaintiffs' witnesses testifying that they did, and the defendant's witnesses that they did not. But the comparative weight to be allowed to the different witnesses, or classes of witnesses, was a matter for the consideration of the jury. If the whole testimony in the case enabled the jury to determine whether the articles in question were commercially known as toys, their commercial designation by those carrying on the business of dealing in them was the safer test, and more in accord with the apparent intent of Congress, and with the rule of construction judicially established in similar cases, than to leave the question, whether "toys" or "earthenware" was the fitter name for these articles, to be decided by the opinion of jurors, based upon their personal knowledge or experience.

In conclusion, upon this instruction the Court said:

* * * The jury having been distinctly instructed that if they found that there was no trade designation of these articles as toys, and that they were not chiefly used as playthings for children, the verdict should be for the defendant, the defendant has no just ground of exception to the instructions given, or to the refusal to instruct as requested.

It should be recalled that the verdict and judgment in the lower court were for the plaintiff, from which it follows that the jury was satisfied that the articles there in controversy were commercially known as toys.

The *Cadwalader* case, *supra*, and many others were cited and followed in principle in *American Express Co. v. United States*, 10 Ct. Cust. Appls. 275, T. D. 38680. See also *Robinson-Goodman Co. (Inc.) v. United States*, 17 C. C. P. A. (Customs) 149, T. D. 43473.

Another case, cited by plaintiff, which is an authority upon the subject of commercial designation is *Neuman & Schwiers Co., Inc. v. United States*, 24 C. C. P. A. (Customs) 127, T. D. 48606. The provision of the statute there under consideration enumerated "sauces of all kinds, not specially provided for." It was held that the term "sauces" was susceptible to proof of commercial designation, and certain imported products designated specifically as "Sauce Bercy" and "Sauce Bordelaise" were nevertheless definitely, uniformly, and generally designated in trade and commerce of the United States as "sauces" at the time of the enactment of the Tariff Act of 1930.

It is obvious, from the cases above discussed with respect to commercial designation, that it would be practically impossible to fulfill orders for merchandise designated solely as "toys" or "jewelry" or "sauces," for instance, without words of specification, and the same would be equally true of an order for "alloys." Nevertheless, each of those terms had a commercial meaning, and, being generic terms, included various articles having their specific designations. As stated by the Circuit Court of Appeals in the *Herrman* case, *supra*—

A descriptive term found in a tariff act may have a commercial meaning which differs from the ordinary meaning, notwithstanding it is not used in trade as a specific designation by which any article or product is bought and sold.

The defendant relies primarily upon the case of *Fung Chong Co. v. United States*, 15 Cust. Ct. 37, C. D. 937, affirmed in *United States v. Fung Chong Co.*, 34 C. C. P. A. (Customs) 40, C. A. D. 342, wherein kumquats were held to be properly classifiable as oranges within the meaning of paragraph 743 of the Tariff Act of 1930.

The Government in that case attempted to establish a commercial meaning of the term "oranges" which excluded kumquats. The trial court held:

* * * that the Government has failed to prove that there is any commercial usage of the term "orange" unqualified by some prefix or that there is any definite, uniform, and general commercial meaning of the term "orange" throughout the United States.

And the appellate court, in affirming the judgment of the trial court, said:

It is true, as pointed out by the court below, that although certain witnesses for the Government testified that the term "orange" had a commercial meaning different from its common meaning, they did not inform the court as to such commercial meaning. The most that those witnesses testified to was that the term "kumquat" was excluded from the commercial meaning of the term "orange."

It seems clear, therefore, that the failure of the Government to prove its case was not due to lack of proof that there was a commercial usage of the term "orange" unqualified by some prefix, but rather because the Government failed to establish a commercial meaning of the term "orange" which would exclude kumquats.

In passing, it may be noted that in the case of *Stephen Rug Mills* v. *United States*, 32 C. C. P. A. (Customs) 110, C. A. D. 293, cited by plaintiff, it was held that certain rugs came within the tariff term "imitation oriental rugs" by commercial designation, although the articles had various quality names and were not in fact imitations of oriental rugs.

Based upon the testimony of trade witnesses, who were unusually well qualified, and applying the principles of decision in the cases above cited, we are of the opinion that the Congress used the term "alloys" in paragraph 302 (o) in its known commercial sense, and we are satisfied that plaintiff has established by the great weight of competent evidence that the term "alloys" has a commercial meaning which differs from its common meaning in that it signifies an intimate and uniform mixture of two or more metals or metals and nonmetals definitely manufactured to rigid specifications, and that the meaning above expressed was uniform, definite, and general throughout the United States at and prior to June 17, 1930. The fact that the terms "alloys" connotes a deliberate mixture according to rigid specifications is sufficient in itself to differentiate the commercial from the common meaning and to exclude from the former an advantitious mixture such as the merchandise in controversy.

Accordingly, we hold that inasmuch as the commodity under consideration here is not commercially known as an alloy, it is not subject to classification in paragraph 302 (o), *supra*, distinguishing *C. J. Tower & Sons* v. *United States*, 19 Cust. Ct. 46, C. D. 1066, which was based upon the common meaning of the term "alloy."

This brings us to a consideration of the principal claim of plaintiff for classification of the importation within the free-list provision in paragraph 1664 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1664), which reads, "Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for" and, therefore, entitled to freedom from duty.

In our former decision, C. D. 1066, we referred to the concession of defendant that if the involved merchandise was not properly dutiable in paragraph 302 (o), *supra*, as an alloy used in the manufacture of iron, it was classifiable free of duty in said paragraph 1664, *supra*, as a metallic mineral substance in a crude state. Defendant in its elaborate brief herein has presented no argument upon this phase of the case, from which we conclude it is still of the opinion which it expressed in the earlier case. The nature, character, composition, and use of furnace sludge, represented by exhibit 1, an obvious residue, viewed in the light of the record and the authorities referred to, *infra*, justify this concession.

In *American Smelting & Refining Co.* v. *United States*, 62 Treas. Dec. 1018, Abstract 22178, it appeared that certain merchandise in "Schedule C" consisted "of fluxes containing small percentages of zinc, copper, gold, silver, sulphur, iron, combined with silica and other natural impurities; * * * that they are not primarily mined or smelted for the recovery of any metal content thereof; that they were imported and used for fluxing copper ores and other cupriferous materials treated in the furnaces of the importing company at the Tacoma plant; that they were not subjected to any processes prior to importation but were imported in their native condition as taken from the ground; * * * " and that certain merchandise referred to as included in "Schedule D" consisted of slag, which is "a residue or furnace by-product containing small percentages of zinc, iron sulphur, gold and silver combined with silica and other natural impurities; * * *." This court held that "the fluxes and slag covered by Schedules 'C' and 'D,' respectively, * * * are metallic mineral substances in a crude state within the meaning of said paragraph 1664 and as such free of duty thereunder," following the decision of the appellate court in *United States* v. *Wells, Fargo & Co.*, 1 Ct. Cust. Appls. 158, T. D. 31211, wherein it was stated that "Metallic mineral substances consist of a metal combined with some foreign or other substance."

Further, this court said in the *American Smelting & Refining Co.* case, *supra*:

The fluxes in suit—
were not subjected to any processes prior to importation but were imported in their native condition as taken from the ground—

and the slag is merely a residue or furnace by-product containing small percentages of certain named metals combined with silica and other natural impurities. Both fluxes and slag, therefore, seem to respond to the court's definition of what constitutes metallic mineral substances in a crude state.

In the case of *Phillips Bros., Inc.* v. *United States*, 15 Cust. Ct. 266, Abstract 50484, the merchandise before the court was so-called

"Ferro Tantale Niobium," which, according to the opinion in that case, was produced as follows:

\* \* \* The ore is treated in an electric furnace to recover the tin. At the same time that the tin is recovered there is a slag formed. This slag consists primarily of oxides of tantalum niobium and perhaps silicious material, and so forth. In order to recover some of the rare metal, tantalum and niobium, the slag is further treated with lime and with charcoal, producing the material shown as Collective Illustrative Exhibit 1 in this case.

Upon the record the court found that the slag contained metal as such, and that it was entitled to free entry as a crude metallic mineral substance as provided in said paragraph 1664. The court also quoted from the opinion of the appellate court in *United States* v. *Nichols Copper Co.*, 29 C. C. P. A. (Customs) 186, C. A. D. 190, as follows:

We have no hesitation in holding that the context of paragraph 1664 clearly shows that Congress intended that substances such as those which are specifically named in paragraph 1664, containing metallic mineral, should be regarded as crude metallic mineral substances.

In *B. R. Lawrence* v. *United States*, 23 Treas. Dec. 643, Abstract 30958, an article described as "aluminum dross," shown by analysis to consist of 86.93 per centum aluminum oxide, 5 per centum aluminum, 4.07 per centum iron oxide, 4 per centum silicia, traces of tin, sulphur, and phosphorus, was held to be a crude metallic mineral substance. In its opinion, this court said:

If we take the view that metallic mineral substances consist of a metal combined with some foreign or other substance, and that it is less advanced than the form of an unwrought metal in that it calls for the expenditure of labor to segregate the metals from the foreign substances, we see no reason to doubt that a dross composed as above stated would answer to that term. In its imported condition the merchandise evidences that it is of value only for the metal contained therein, and that it is a waste material. A waste material which is a crude metallic mineral substance, however, would find classification properly under paragraph 183, rather than under paragraph 479. \* \* \*

In *Marks Lissberger & Sons, Inc.* v. *United States*, 73 Treas. Dec. 1035, T. D. 49634, the merchandise before the court, as appears from its decision in that case, consisted of a solder dross or oxide consisting of the skimmings from the tops of pots and kettles, a byproduct obtained in the manufacture of solder. It contained 36 per centum of tin and 50 per centum of lead. It was held to be entitled to free entry, as provided in paragraph 1664, *supra*, as a metallic mineral substance in a crude state, such as drosses or skimmings. In the course of our opinion in that case, commenting upon the fact that the Tariff Act of 1922 did not provide for "drosses, skimmings," as does paragraph 1664, *supra*, we said:

Manifestly, the new phraseology in said paragraph gives to the term "Metallic mineral substances in a crude state" a more definite meaning by naming as exemplars certain metallurgical byproducts, to wit, "drosses, skimmings, residues, brass foundry ash, and flue dust."

The abrasive sludge in controversy is clearly, a residue, and the analysis of it, as quoted earlier in this opinion, indicates that it contains metal as such. Being one of the exemplar products enumerated in said paragraph 1664, we find and hold, in view of the foregoing authorities, that the importation in issue is a metallic mineral substance in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for, and is entitled to entry free of duty. In view of this conclusion, it is unnecessary to consider the alternative claim for classification as waste, as provided in paragraph 1555, *supra*, the provisions of paragraph 1664, *supra*, being more specific. *B. R. Lawrence* v. *United States, supra.*

Plaintiff's claim that the importation here under consideration is provided for in paragraph 1664 and hence entitled to free entry is sustained. All other claims are overruled.

Judgment will be entered in harmony with the views above expressed.